PARKER WIRE GOODS CO., PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket Nos. 3999, 5452.  Promulgated October 3, 1927.

LOSSES RATHER THAN BAD DEBTS.—Upon the evidence, *held*,
that certain transfers of moneys and properties by the president
and minority stockholder of the petitioner to another corporation
in which the said president and minority stockholder was the prin-
cipal stockholder, the latter corporation being at all times insolvent,
amounted to a fraudulent appropriation of the petitioner's goods
and that the losses suffered by the petitioner on account thereof
were deductible as "losses sustained" during the taxable years
1918 and 1919 instead of as "debts ascertained to be worthless and
charged off" within the year such losses were discovered.

*J. Robert Sherrod, Esq.*, for the petitioner.
*M. N. Fisher, Esq.*, for the respondent.

In this proceeding the petitioner seeks a redetermination of its
income and profits-tax liability for the calendar years 1918 and 1919,
for which the Commissioner has determined deficiencies in the sums
of $21,356.58 and $5,241.34, respectively.  The issue involved is
whether the petitioner sustained losses during 1918 and 1919 due to
an alleged embezzlement of moneys and properties on the part of one
of its minority stockholders who was also its president.  A motion for
the consolidation of the appeals was granted.

### FINDINGS OF FACT.

The petitioner is a Massachusetts corporation, having its place of
business in Worcester.  It was incorporated in 1901 with an author-
ized capital stock of $10,000, divided into 100 shares having a par
value of $100 each.  Its shares at that time were subscribed for and
issued as follows:

|  | Shares. |
|---|---|
| Arthur H. Parker | 31 |
| Edward D. Priest | 30 |
| Mabel Caldwell Willard | 25 |
| Jeanette S. Priest | 2 |
| James M. Jackson | 2 |
| Frank C. Turner | 10 |
| Total | 100 |

Prior to 1918 its stock was increased to 250 shares, par value $100
each, the additional shares being fully paid up.  During the taxable
years 1918 and 1919 its outstanding stock was owned as follows:

|  | Shares. |
|---|---|
| Edward D. Priest | 140 |
| Arthur H. Parker | 60 |

| | Shares. |
|---|---|
| Mabel C. Willard | 49 |
| George S. Davis | 1 |
| | |
| Total | 250 |

Edward D. Priest, Arthur H. Parker and Mabel C. Willard were cousins and had been born and reared together in Northfield, Mass. The stockholders had from 1901 to 1921 allowed Parker to manage the business of the corporation and it was commonly understood by the public and the employees that he was the principal owner. Parker had always been furnished proxies and Priest had never attended a stockholders' or directors' meeting after the petitioner was incorporated until December, 1921.

The petitioner was organized to manufacture, buy and sell hardware and wire goods. Parker was the president, general manager and clerk. From time to time, he furnished the stockholders with a written report of the results of his management, including a balance sheet. The balance sheets so furnished to Priest represented the accounts receivable and notes receivable due the petitioner to be as follows on the dates indicated:

| | Accounts receivable. | Notes receivable. |
|---|---|---|
| January 1, 1917 | $65,621.76 | $37.50 |
| December 31, 1917 | 69,994.83 | None. |
| December 31, 1919 | 91,291.13 | 17,385.01 |

Priest, the principal stockholder, questioned Parker about the increasing accounts receivable and was assured by Parker that none of the accounts receivable shown on the balance sheets exceeded three or four thousand dollars. It was true, however, that one corporation, The Stenman Wire Specialty Co., owed the taxpayer the following amounts as of the dates indicated below:

| December 31, 1916 | $5,631.88 |
|---|---|
| December 31, 1917 | 11,526.27 |
| December 31, 1918 | 29,462.35 |
| December 31, 1919 | 50,337.58 |
| December 31, 1920 | 63,164.91 |

The petitioner manufactured wire specialty goods such as screw eyes, gate hooks, coat hooks, etc., in rented space on the sixth floor of the Bradley Building, Worcester, Mass. At some time prior to 1916 Parker had organized or secured control of the Stenman Wire Specialty Co., a corporation (hereinafter referred to as Stenman Company). He was the principal stockholder therein. His housekeeper owned some of the stock of the Stenman Company. This corporation was also located in the same Bradley Building on the sec-

ond floor, and was engaged in the manufacture of similar products. Parker also acted as manager for the Stenman Company, a Mr. Sanders acting as manager in Parker's absence. The Stenman Company obtained the greater part of its raw material (wire) from the petitioner in lots of 100 pounds, upon the basis of prices per carload lots. Such raw material costs 15 or 16 per cent more if purchased in lots of around 100 pounds. Nothing was added by the petitioner for insurance or storage. The Stenman Company had also borrowed part of its machinery from the petitioner. Parker assigned one of the petitioner's employees, Wellsley H. Lawrence, to duty with the Stenman Company, but Lawrence was paid only by the petitioner corporation. The financial condition of the Stenman Company, as shown by statements filed by said company with the secretary of the Commonwealth of Massachusetts, was as follows on the dates indicated:

STENMAN WIRE SPECIALTY CO.

*Balance Sheet.*

|  | Dec. 31, 1917 | Dec. 31, 1918 | Dec. 31, 1919 | Dec. 31, 1920 |
|---|---|---|---|---|
| *Assets* |  |  |  |  |
| Machinery, tools, and equipment | $5, 038. 27 | $6, 412. 37 | { $3, 793. 42<br>{ 5, 931. 46 | $6, 219. 89 |
| Merchandise, including manufactured merchandise, material and stock in process | 7, 555. 21 | 5, 124. 29 | 5, 280. 83 | 1, 659. 52 |
| Cash and debts receivable | 5, 785. 13 | 11, 069. 97 | 20, 825. 81 | 252. 31 |
| Cash |  |  | 25. 58 | 122. 64 |
| Patent rights | 1, 000. 00 | 2, 000. 00 | 2, 000. 00 | 2, 000. 00 |
| Profit and loss | 16, 996. 98 | 26, 167. 65 | 32, 736. 99 | 47, 689. 94 |
| *Liabilities* | 36. 375. 59 | 50, 774. 28 | 70, 594. 09 | 57, 944. 30 |
| Capital stock | 6, 000. 00 | 6, 000. 00 | 6, 000. 00 | 6, 000. 00 |
| Accounts payable | 17, 224. 59 | 34, 074. 28 | 41, 938. 61 | 31, 635. 13 |
| Floating indebtedness | 13, 151. 00 | 10, 700. 00 | 22, 655. 48 | 20, 309. 17 |
|  | 36, 375. 59 | 50, 774. 28 | 70, 594. 09 | 57, 944. 30 |

As shown by the above balance sheets of the Stenman Company, its liabilities exceed its assets as follows:

| | |
|---|---|
| December 31, 1917 | $10, 996. 98 |
| December 31, 1918 | 20, 167. 65 |
| December 31, 1919 | 26, 736. 99 |
| December 31, 1920 | 41, 689. 94 |

For some time prior to 1918 and during the taxable years, Parker caused the petitioner corporation to advance to the Stenman Company moneys to meet its pay rolls. The Stenman Company rarely failed to meet its pay roll in this manner. The petitioner's bookkeeper strenuously objected to this practice because in her opinion there was no chance of the petitioner recovering these sums in view of the financial condition of the Stenman Company, and further because the petitioner needed cash for its own purposes.

During the year 1918 the transactions between the petitioner and the Stenman Company as reflected by the petitioner's books are summarized as follows:

| | Charges | Credits |
|---|---|---|
| **1918** | | |
| Sales to Stenman | $6,904.04 | |
| Cash payments to Stenman | 29,198.13 | |
| Purchases from Stenman | 446.99 | $18,273.62 |
| Purchases from Stenman | 446.99 | $18,273.62 |
| Entries in journal a/c payable column | 109.92 | 23.95 |
| Entries in journal a/c receipts column | 847.67 | |
| Entries in journal credits | $13,756.90 | |
| Less entry recording payment by note which note can not be found and was never paid | 13,294.56 | 462.34 |
| | 37,506.75 | 18,759.91 |
| Less total credits | 18,759.91 | |
| | 18,746.84 | |
| Less discrepancy | 810.76 | |
| Net charges | 17,936.08 | |
| **1919** | | |
| Sales to Stenman | 7,978.93 | |
| Cash payments to Stenman | 18,662.99 | |
| Purchases from Stenman | 192.65 | 12,238.66 |
| Entries in journal a/c receipts column | 7,225.72 | 661.28 |
| Entries in journal a/c payable column | | 3.96 |
| Cash payments from Stenman | | 270.00 |
| Total | 34,060.29 | 13,173.90 |
| Less total credits | 13,173.90 | |
| | 20,866.39 | |
| Less discrepancy | 11.16 | |
| Net charges | 20,875.23 | |

Parker warned several employees whom Priest was likely to meet if he visited the plant that the existence of and the transactions with the Stenman Company should not be mentioned to Priest, stating that Priest knew nothing of and was to know nothing of these matters.

The manufacture of goods ordered from the petitioner was delayed because it was short of raw material, which shortage was caused by the transfers of raw material to the Stenman Company. On one occasion a salesman, after trying for a considerable time, was successful in securing an order from Landers, Frary & Clark, a large hardware company, for 10,000 knife handles, provided delivery was made within a certain time. The salesman in checking up on this order found that said order and the materials necessary to fill it had been transferred to the Stenman Company.

In his reports to the stockholders of the petitioner corporation, Parker stated that while business had been good, it would have been better if the petitioner had not been handicapped by inability to get raw material.

At the close of 1918, Parker gave the petitioner's bookkeeper orders to record in its journal the following entries:

Dr: Suspended entries, December 31, Sales Account____ $13, 294. 56
    Cr: Raw Material_____ $13, 294. 56

Dr: Notes Rec_____ 13, 294. 56
    Cr: Stenman Wire Specialty Co_____ 13, 294. 56
    To correct error in entry above.

The effect of these entries was (1) to reduce the sales and purchases for the year, (2) to increase the ratio of profits on sales, and (3) to reduce the amount of accounts receivable shown at the end of 1918.

The bookkeeper never saw the note for $13,294.56 and Parker, when questioned about it in 1921 stated that he knew nothing about it. An accountant investigating in 1921 found an unsigned note for the same amount among the effects of the Stenman Company. This note was never paid.

Among the transactions between the petitioner and the Stenman Company, as reflected by the petitioner's books of account, there appear entries showing that on July 16, 1919, Parker personally withdrew by means of four checks on four different banks a total sum of $7,050, and directed the bookkeeper to charge it to an account labeled "A. H. Parker account #2." At the end of 1919, Parker directed the bookkeeper to charge the $7,050 to the Stenman Company which was done. These checks were cashed personally by Parker on July 16, 1919.

In December, 1921, Priest, who lived in Schenectady, New York, received a letter from one of the employees of the petitioner corporation suggesting a conference. Priest met this employee in Albany, N. Y., and in this manner learned for the first time of the existence of the Stenman Company, its ownership and something of the nature of the transactions between it and the petitioner, all under the management of his cousin, Parker. Priest came to Worcester, engaged a public accountant, and called on Parker. When again questioned about the petitioner's business, Parker again assured Priest that the business was in good shape, and that none of the accounts receivable were large. Priest demanded a list of the accounts and Parker suggested " going to lunch." When told it was too early for lunch, Parker admitted that when Priest saw the accounts he would want to discharge him.

Parker was not prosecuted due to the family relationship between him and Priest. The Stenman Company returned to the taxpayer the machinery it had borrowed and the machinery owned by the Stenman Company was also taken by the petitioner. Its value was fixed at $3,500 by a neutral person and this amount was credited

against the debits for cash and raw materials transferred to the Stenman Company and applied against the earliest withdrawals which were prior to 1918.

OPINION.

GREEN : The question here is whether the moneys and properties transferred by Parker from the petitioner to the Stenman Company during 1918 and 1919 amounted to embezzlement, thereby entitling the petitioner to a deduction from gross income on account of " losses sustained " during 1918 and 1919, respectively, or whether such transfers were in fact *bona fide* advances and sales to the Stenman Company, in which case the petitioner would only be entitled to a deduction for " bad debts " in the year in which such debts were ascertained to be worthless and charged off. The petitioner claims that Parker's actions amounted to embezzlement, whereas the Commissioner contends they were *bona fide* advances and sales. The petitioner relies on section 234(a)(4) of the Revenue Act of 1918, whereas the Commissioner relies on section 234(a)(5) thereof. Subparagraphs (4) and (5) of section 234(a), *supra*, provide as follows:

SEC. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\*   \* .   \*   \*   \*   \*   \*

(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise;

(5) Debts ascertained to be worthless and charged off within the taxable year.

Embezzlement losses not compensated for by insurance or otherwise are deductible in the year in which they are " sustained " rather than in the year in which they are first discovered. They are deductible as " losses sustained " rather than as " debts ascertained to be worthless." *Appeals of Emil Stern, et al.*, 5 B. T. A. 89. See also *Appeal of Webb & Bocorselski, Inc.*, 1 B. T. A. 871. *Appeals of J. A. Bentley, et al.*, 5 B. T. A. 314. *National Sash & Door Co.* v. *Commissioner*, 5 B. T. A. 931.

Did the petitioner sustain embezzlement losses as a result of Parker's actions or were such losses as it suffered essentially in the nature of bad debts? We do not believe that the moneys and properties transferred by Parker from the petitioner to the Stenman Company during 1918 and 1919 were in fact *bona fide* advances and sales to the latter company. In our opinion the facts as set out in the findings clearly show that the transactions between the petitioner and the Stenman Company were inherently fraudulent on the part of Parker. He as an officer of the petitioner " ostensibly loaned " cash and machinery to an insolvent corporation principally owned by him-

self and his housekeeper. He also " disposed " of certain raw materials to the same insolvent corporation. He was in control of both corporations and can not be said not to have had knowledge of the financial condition of the Stenman Company. He personally took $7,050 in cash during 1919 and later had it charged to the Stenman Company. In order to set at rest Priest's suspicions, Parker ordered the bookkeeper to make an entry as of December 31, 1918, which had the effect of reducing the " accounts receivable " (the only item Priest had ever inquired about) in the amount of $13,294.56. Although Parker told the bookkeeper he had received a note for $13,294.56 from the Stenman Company, it appears that he never signed or delivered such note, as it was found unsigned among the Stenman Company effects, by the public accountant, in 1921. He then denied all knowledge of the note. Parker ordered several employees whom Priest was likely to meet if he visited the plant not to mention the Stenman Company or the transactions had with such company. Cash was advanced to the Stenman Company at times when the petitioner needed it. Raw materials were transferred to the Stenman Company when they were needed by the petitioner, resulting in delay in filling orders and dissatisfaction among the petitioner's customers. The Stenman Company was a *competitor* making practically the same line of goods. Valuable orders obtained after long effort by salesmen for the petitioner were transferred to the Stenman Company, together with the materials necessary to make the articles so ordered. An employee was assigned to duty with the Stenman Company by Parker but paid by the petitioner. Parker made false statements to Priest and the other stockholders in rendering annual reports when he represented that business would have been larger except for the inability to get raw materials, when at the same time he was disposing of badly needed raw materials to the Stenman Company. Materials were transferred to the Stenman Company at carload lot prices, which were 15 or 16 per cent under cost prices on the hundred-weight basis. Parker's conversation with Priest in December 1921, when detailed statements were demanded, shows a guilty mind.

In our opinion all of the foregoing circumstances clearly show Parker's intent to fraudulently manage the petitioner's affairs to its detriment and to the benefit of himself and his housekeeper, through his artificial creature, the Stenman Company. We think that under such circumstances the losses suffered by the petitioner are not essentially in the nature of bad debts but come within the embezzlement decisions cited above.

None of the losses sustained by the petitioner during 1918 and 1919 on account of Parker's actions between it and the Stenman

Company were compensated for by insurance or otherwise. We are, therefore, of the opinion that the petitioner is entitled to deduct under section 234(a)(4) of the Revenue Act of 1918 the amounts of $17,936.08 and $20,875.23 as losses sustained during 1918 and 1919, respectively. The deficiencies should be recomputed accordingly.

*Judgment will be entered on 15 days' notice, under Rule 50.*

Considered by STERNHAGEN, LANSDON, and ARUNDELL.